## Ege *et al.* *versus* Medlar *et al.*

1. Michael Ege, for the "purpose of promoting the interest of Elizabeth (wife of his son George) separate and apart from that of her husband," by deed dated June 2d 1815, conveyed certain tracts of land to Miller in trust "for the said Elizabeth, her heirs and assigns for ever and for her and their sole and separate use and benefit," and by the deed provided for a sale by the trustee (the wife or her heirs joining in the deed), the proceeds of the sale to be paid to her for her sole and separate use, and to be disposed of as she might think proper, by will, deed or otherwise : *Held,* that her husband, who survived her, had an estate by the curtesy therein : *Held* also, that the power of sale, as it did not of itself work a conversion, did not affect the curtesy.

2. Where the execution of a deed in evidence has been duly proved, slight and inconclusive evidence, offered to show that it was a forgery, ought not to go to the jury.

3. In ejectment by the heirs of Elizabeth Ege, who claimed title under this deed, the certified copy of it in evidence showed that the deed was signed, sealed and delivered by the grantor before two witnesses, that it was duly

[Ege v. Medlar.]

acknowledged and that probate was made of it under oath by one of the witnesses thereto just before it was recorded. It was not recorded till 1848. For the purpose of showing it to be a forgery (or that it was never delivered), evidence was admitted in the court below to show that the "George Ege" tract therein mentioned (and intended to be conveyed thereby) was identical with the "James Love" tract which was subsequently included in certain proceedings in partition of the lands of Michael Ege, deceased, as to which he died intestate : *Held* to be error.

4. When a disseisor enters upon and cultivates part of a tract, he does not thereby hold constructive possession of the whole tract, unless his entry was by color of title by specific boundaries to the whole tract.

5. Elizabeth Ege died in 1848 and her husband in 1858 : *Held* that the thirty years limitation provided for by the Act of 22d April 1856, did not begin to run against the heirs of Elizabeth till the death of her husband.

6. Plaintiffs offered in evidence an abstract of title furnished by defendants under a rule of court, for the purpose of showing admissions by the latter of the title under which plaintiffs claimed : *Held*, that the evidence was admissible.

7. A writ of ejectment for 283 acres was served on three tenants in possession and they pleaded not guilty ; when the case was called for trial, more than a year afterwards, the court admitted their landlord to defend for a part of this tract, the landlord filing a draft of the part for which he defended, but no disclaimer. *It seems* that this was not error.

8. In closing to the jury counsel for the plaintiffs offered to read to the jury as part of his argument on the facts of this case the opinion of this court in another ejectment suit on the same title, which offer was refused. *It seems* that this was not error.

May 11th and 12th 1876. Before AGNEW, C. J., MERCUR, GORDON and WOODWARD, JJ. PAXSON and WILLIAMS, JJ., absent. SHARSWOOD, J., did not sit in this case.

Error to the Common Pleas of *Cumberland county :* May Term 1876, No. 65.

Ejectment, begun August 14th 1874, by Caroline and Emma K. Ege, Joseph B. Haverstick and Emma his wife in her right, S. Kate and George F. Ege, Robert and Charles Ege by their guardian, Joseph B. Haverstick, and Elizabeth Given, against Frank B. Medlar, Frederick Roberts, Henry Ward and the Mount Holly Paper Co., for a tract of land known as the Moses Foulke tract, situate in South Middleton township, containing 283 acres and 40 perches, more or less. Plea, not guilty.

The plaintiffs claimed title as children and grandchildren of Elizabeth Ege, wife of George Ege. The defendants claimed under George Ege, by a sheriff's sale of his property and certain mesne conveyances, and under the Statute of Limitations. Medlar, Roberts and Ward were tenants in possession upon whom the writ was served, and on the day of the trial the Mount Holly Paper Company was admitted as landlord to defend for forty acres and forty-two perches of the land described in the præcipe. The plaintiffs excepted to allowing the company to defend unless on the issue already formed.

Evidence for the plaintiffs.

The tract is shown in the annexed draft :—

[Ege *v.* Medlar.]

(Draft of the Moses Foulke tract, showing the line of the old and new fences and the old line of houses at the ore bank.)

1. Application by Stephen Foulke for 300 acres of land for Moses Foulke, January 28th 1767, and a survey in pursuance thereof for 283 acres and 40 perches, as described in the writ in this case.

2. Deed, Stephen Foulke and wife to Kittera, Jago and Boyd, dated June 17th 1795, for, *inter alia*, the same tract.

3. Deed, Robert Grayson, sheriff, to Michael Ege for, *inter alia*, the same tract, dated June 1st 1803, and as the property of Kittera, Jago and Boyd.

4. Deed of trust, dated June 2d 1815, and recorded June 7th 1848, Michael Ege to John Miller, for the Moses Foulke tract and six other tracts, in trust for Elizabeth Ege, wife of George Ege (one of the sons of Michael Ege), " her heirs and assigns for ever, and for her and their sole and separate use and benefit, with full power in said trustee, together with Elizabeth Ege or her heirs consenting and joining with said trustee, to sell and convey in fee simple, the whole, &c., of said property, &c., the proceeds thereof to be paid to Elizabeth Ege, for her sole and separate use, to be used and disposed of as she may think proper, either by will, deed or otherwise."

The certified copy of this deed, which was put in evidence, purported to have been duly signed and sealed, and delivered by Michael Ege, in presence of George D. Foulke and George Pattison ; it bore a certificate of acknowledgment by the grantor, of even date with

the deed itself before a justice of the peace, and probate was made of it on affirmation by George D. Foulke, a few days before the deed was recorded. The original deed was not produced at the trial, nor was any attempt made to explain its absence or loss.

5. Family record, showing that the plaintiffs were the heirs at law of Elizabeth Ege, and that she died December 6th 1848, and George Ege, her husband, died February 11th 1858.

The plaintiffs (after putting in evidence the writ of ejectment in the case) placed in evidence proceedings in partition of the real estate of Michael Ege, deceased, in 1816, in which fifty-nine tracts were specified by the warrantees' names, but no mention was made of the Moses Foulke tract in question. In these proceedings the Mount Holly Estate, adjoining this tract and containing over 6000 acres, was awarded to George Ege, by the names of the warrantees and the number of acres warranted to each of them. Plaintiffs then offered the abstract of title furnished by the defendants under rule of court, to show that the defendants admitted that the title to the lands in dispute had been in Michael and George Ege, and that they claimed title under both of the latter and for a portion only of the Holly Furnace Estate. This offer was refused and a bill sealed for the plaintiffs.

Plaintiffs proved triennial assessment of Holly Estate in name of Michael Ege, up to 1814.

The defendants, for the purpose of showing that Michael Ege never executed the deed of trust to John Miller, offered to show that the George Ege tract, purporting to be conveyed by that deed, was not surveyed until 1844 (the survey showing the identical courses and distances, and quantity of land shown by the trust deed), that by a deed dated June 2d 1815, which George Ege refused to accept, and which was therefore never delivered, Michael Ege intended to convey to George Ege this latter tract, therein called the James Love tract, and that this latter tract was awarded to George Ege, by the above proceedings in partition, to be followed by other evidence inconsistent with the genuineness of the trust deed. This offer was sustained and a bill sealed for the plaintiffs. Defendants gave evidence to prove these facts, and then offered to show that the James Love tract and the George Ege tract were the same tract. Plaintiffs objected, the evidence was admitted and bill sealed for plaintiffs. (This was the subject of the fourth assignment of error.) The defendants then gave evidence tending to show that the James Love tract was the same as the George Ege tract. It further appeared that the same description as that contained in the deed of 1815, with the exception of a single line, appeared in the above deed of Stephen Foulke to Kittera in 1795.

The defendants then offered a judgment of Farmers' and Mechanics' Bank against George Ege, and an amicable agreement thereunder for condemnation of the forge and furnace estate of Mount

[Ege *v.* Medlar.]

Holly Iron Works, containing about 7689 acres, by a description including within its exterior lines the Moses Foulke tract, the description being only by outside boundaries of adjoining owners; also, a sheriff's sale thereunder, and a subsequent sheriff's deed dated August 20th 1838, to the bank for the lands mentioned in the condemnation.

They then proved the following deeds: (1) Farmers' and Mechanics' Bank to Geisse & Kropff for the Mount Holly Iron Works Estate, as described in the condemnation, July 1st 1846 ; (2) Kropff to Geisse for his interest therein ; (3) Sheriff to Farmers' and Mechanics' Bank for the same (sold as the property of Kropff & Geisse) November 19th 1849 ; (4) Farmers' and Mechanics' Bank to Freedly for the same, September 30th 1851 ; (5) Freedly's executors to Given for the same, March 10th 1852 ; (6) Given to Kempton for about 1000 acres, part of the Mount Holly estate ; (7) Kempton to the Mount Holly Paper Co., for the same, August 13th 1858, embracing the lands in controversy, July 14th 1868 ; (8) Leases by the Paper Co. to the tenants in possession.

George Ege carried on the Mount Holly Iron Works, of which the Moses Foulke tract constituted a part, during the lifetime of his father, from the early part of 1815 to the date of the sheriff's sale in 1838.

Part of the land claimed was situated close to the furnace, and had always been called the "furnace field;" this contained about fifteen acres, partly situated upon the Moses Foulke tract and partly upon the Mount Holly land ; it was enclosed by a fence.   There was also a row of small houses partly on this tract (as shown in the draft) usually occupied by the men employed at the furnace. This field was enclosed and cultivated from 1838 down to the bringing of this action, by the owners of the furnace property.   There was evidence to show that the owners from time to time took out large quantities of ore from the ore-banks west of the "furnace field," for the furnace, as early as 1846, and from then to 1855. After 1855 the ore-banks were worked by various lessees under Given, and the Paper company.   There was also a spring of water west of the "furnace field," which was used in washing ores.

Kropff testified that he went into possession of the furnace field in 1846, and cultivated it; and that he took ore out of the western ore-bank, and used the woodland in the rear of the ore-bank for firewood.   That the "furnace field" was kept enclosed and cultivated till he left there in 1848 ; that all the lands within the exterior lines of the map of the above draft were occupied and used by him and his partner when they were there.

Cross-examined : The fence was east of the row of houses, when I was there; a worm fence; we kept it in repair while we were there.   We used ore out of the drift for one and a half years.   Cannot say that work was going on every day ; might have been interruptions.   When we left, drift was open and work going on.   Got

[Ege *v.* Medlar.]·

ore from different other places.   Didn't know anything about the
Moses Foulke survey.   Cut timber over the whole estate just as we
wanted it.

In summing up, the plaintiff's counsel offered to read the opinion
of the Supreme Court in Kille *v.* Ege, 29 P. F. Smith 15, so far
as applicable to the facts of this case, admitting that the jury were
bound to accept the law as given to them by the court and to apply
the facts of the case to the law as laid down by the court.

Offer refused, and bill sealed for plaintiffs.

The learned judge (Herman, P. J.) charged at length as to the
evidence affecting the validity of the trust deed to John Miller ; that
the presumption of law was in favor of the deed and that it would
require the most satisfactory proof on the part of the defendants to
invalidate it.   Further, that the Farmers' and Mechanics' Bank,
and those who claimed under them, were in possession under a color
of title and that therefore their possession was co-extensive with the
title ; but that by the deed from Given to Kempton of a tract
including the forty acres and forty-two perches, the possession had
been drawn in from the exterior lines to the new boundary, and
after that all that part of the Moses Foulke tract outside of the land
claimed by the Paper company, passed from the possession of those
under whom the defendants claimed.

[" But the defendants have assailed the validity of this trust deed
and contend that it never was executed and delivered by Michael
Ege, Sr., but that it is a fraud and a nullity.   Although purporting
to have been executed and acknowledged on the 2d June 1815, it was
not put upon the record until 7th June 1848—thirty-three years
afterwards—and this, in connection with the fact that the original is
not to be found by any one in existence, the defendants say excites
suspicion, and they have given evidence to prove certain things
which they contend are wholly inconsistent with the genuineness
of the deed and irreconcilable with its execution and delivery.
There is no living witness to tell us anything about its execution or
delivery. * * * On the other hand you have evidence tending to
prove that the George Ege tract in the deed of trust, and the James
Love tract in the proceedings in partition, are identical, and that the
same is assigned to George Ege under the proceedings in partition,
and also that a small portion of the Stephen Foulke survey is covered
by the Moses Foulke survey, or rather overlaps or interferes with it.
And this is relied upon to countervail the corroborating proof in
support of the deed—that the whole seven tracts mentioned in the
trust deed are omitted from the proceedings in partition.   Then
you have the George Ege survey returned to the land office 2d May
1845, by Patrick Davidson, who was not appointed deputy surveyor
until in 1833, certifying in his return that he made the survey the
11th and 12th December 1844.   Showing that the courses and dis-
tances are identical with the description of the George Ege tract in
the trust deed.   And in connection with this you have the evidence

· [Ege *v.* Medlar.]

of Esquire Evans and the connected draft made by him from the
official surveys of the adjoining tracts to the George Ege tract,
tending to show that no return of survey or that no courses and
distances identical with those in thê trust deed could be made up
from them—or, in other words, that no chamber survey identical
with that in the trust deed could have been made from drafts of the
adjoining surveys.]

[" The defendants to prove their title have given in evidence a
judgment, fi. fa. and levy by the Farmers' and Mechanics' Bank
against George Ege, and an amicable condemnation given by
George Ege on the fi. fa. of the forge and furnace estate called
Mount Holly Iron Works, by a description including the lands in
dispute, the description being by outside boundaries of adjoining
owners. * * *

" Although the Moses Foulke tract formed part of the lands
described in the amicable condemnation given by George Ege, and
seems to have been in his possession, along with the lands assigned
to him, under the proceedings in partition, up to the time of the
sheriff's sale in 1838, yet he acquired no title as against his wife
to this tract, and consequently no title prejudicial to the wife's
estate therein passed to the purchaser at the sheriff's sale ; but being
actually a portion of the lands included in the description of the
lands condemned by the amicable condemnation, and sold and con-
veyed by the sheriff's deed to the bank, whatever possession the
bank and the successive alienees under them down to the defend-
ants have had, has been under color of title.    An entry is by color
of title when it is made under a bonâ fide and not pretended claim
to a title existing in another.

" Now the defendants have given evidence to show that they,
and those under whom they claim, have held the land in dispute
by an enclosure and cultivation for the full statutory period.   The
furnace field spoken of by so many witnesses, is wholly on the dis-
puted land, and the evidence shows pretty conclusively that they
have kept it enclosed with a fence and used it for the ordinary and
usual purposes of arable or farm land—cultivating it in grass and
grain, taking from it the crops, and keeping it improved year after
year, from 1838 down to the time of the commencement of this action.
There is also evidence in the cause showing that they mined and
took large quantities of iron-ore from the ore-bank west of the fur-
nace field, known as the Wynkoop bank, from an early day, cer-
tainly as early as 1846, and used the ore to supply the furnace at
such times as it was in operation, on down to 1855, when the fur-
nace was finally closed out ; and that since 1855 the ore-bank has
been worked by different lessees at various times under Given and
the Mount Holly Paper Company.   Also that the spring of water
west of the field was used by some of the tenants living·in the old

log row, which stood on the west side of the field, and that the water from the spring was used at different times for washing ore.

" There is sufficient evidence in the cause to submit to you on the question of adverse possession, * * * we say to you that the possession by enclosure and cultivation of that part of the Moses Foulke survey known as the furnace field was co-extensive with the bounds of the survey; but the very moment new boundaries were defined. by the conveyance of Given to Kempton of the forty acres and forty-two perches now defended for by the Mount Holly Paper Company, and which includes the furnace field, that very moment the possession was drawn in from the outer lines to the lines of the new boundary, and thenceforth all that part of the (Moses Foulke) survey outside of the boundaries of the land claimed by the Mount Holly Paper Company, passed from the defendants' possession."]

[" If you find that they have so held the adverse possession, you will render your verdict for the plaintiffs against Frank B. Medlar, Frederick Roberts and Henry Ward, three of the defendants, for the land described in the præcipe, except that portion containing forty acres and forty-two perches, contained and embraced within the boundary lines of the Mount Holly Paper Company's claim, which is described in the application and draft filed in this case by said company at the time they were admitted as co-defendants to defend for the part described in said application and draft.]

The following are some of the points presented by the plaintiffs and the answers to them :—

4. Taking all the evidence given by the defendants and admitted by the court, touching the execution of the deed of June 2d 1815, viz. : that upon the warrant of July 30th 1814, to George Ege, the deputy-surveyor made a return, accepted 2d May 1845, that he surveyed the tract on December 11th and 12th 1844; and that his survey is by the same courses and distances, and for the precise quantity of land by which it is described in the deed of trust; that the Love tract and the George Ege tract are located upon the same ground; that the Stephen Foulke tract and the Moses Foulke tract, as described in the two deeds dated July 2d and July 3d 1815, interfere with each other; there is nothing which would warrant the jury in inferring fraud in the execution and delivery of the said deed of trust.

The evidence of the execution, &c., of the deed being positive and direct; while the inference drawn from the facts above stated are based merely on a presumption.

Answer. " We have submitted this evidence to you and it is for you to determine from all the evidence in the cause the genuineness of the trust deed. But we say to you that the law presumes from the recorded deed as it appears, both execution and delivery, and to

[Ege *v.* Medlar.]

overthrow the deed the evidence must satisfy your minds that it is a fraud or that it was never delivered.''

7. The trust declared by Michael Ege in his deed of 2d June 1815, to John Miller, creates an equitable estate in fee in Elizabeth Ege, and there is nothing in the trust deed to prevent its descent as a fee under the laws regulating descents, and these defendants claiming otherwise must show that they have a written title from Michael Ege, the deceased, by which it came to them; and not having shown any such title, there is nothing to exclude the surviving husband of Elizabeth Ege from his rights as tenant by the curtesy; and as George Ege did not die until 1858, and this suit was brought in 1874, the possession shown by defendants for a portion of the land in dispute amounts to nothing, and plaintiffs are entitled to recover the whole of the land described in the writ.

Answer. '' We cannot answer this point as requested.  *   *   * The trust, it will be perceived, is not only for the sole and separate use of the wife, but also for the sole and separate use of her heirs, and confers upon the trustee power to sell and convey—the said Elizabeth Ege or her heirs consenting and joining—and with power in her to appoint another trustee or trustees, on the death of the trustee named in the deed.  The intention of the grantor is apparent to our mind that the husband was to be excluded from all interest as tenant by the curtesy.  We therefore refuse to affirm this point, and say to you that under the terms of the deed George Ege had no curtesy.''

9. The possession shown by the defendants of the old furnace field is not such adverse, continuous and hostile possession for twenty-one years as gives title by the Statute of Limitations; and even if it were, the statute did not commence to run against the plaintiffs in this case until after the death of George Ege, which occurred in 1858, not twenty-one years prior to the bringing of this suit, and therefore plaintiffs are entitled to recover the old furnace field, with the other lands included in the writ.

Answer. '' This point is refused.  Having decided that George Ege had no curtesy in the lands contained in the trust deed, the title of the defendants by adverse possession under the Statute of Limitations, has been established, if the evidence satisfies you that they and those under whom they claim have been in actual, adverse, visible, notorious and continued possession of the land in dispute, or any part of it, either by cultivation or enclosure, for the period of twenty-one years next preceding the time of bringing this suit.  We cannot say, as requested, that the possession shown by the defendants of the old furnace field is not such adverse, continuous and hostile possession for twenty-one years as gives title by the Statute of Limitations.  We think the adverse possession required by the statute of the old furnace field by the defendants and those under whom they claim has been very clearly proved.''

[Ege v. Medlar.]

The jury found a verdict for the plaintiffs against Frank B. Medlar, Frederick Roberts and Henry Ward, three of the defendants, for the land described in the præcipe, except that portion containing forty acres and forty-two perches contained and embraced within the boundary lines of the Mount Holly Paper Company's claim, which is described in the application and draft filed in the case by said company at the time they were admitted as co-defendants to defend for the part described in said application and draft, and six cents damages.

Judgment upon the verdict.

The plaintiffs below took this writ of error, and made twenty-four assignments of error, of which the following are important:—

The court erred,

1. In allowing the Mt. Holly Paper Company to appear, when the case was called for trial, to defend as landlords, and to limit their defence to a small portion of the land embraced in the writ.

2. In rejecting plaintiffs' offer of the abstract of title furnished by defendants.

3 and 4. In admitting the evidence given above of the identity of the George Ege and James Love tracts.

10. In refusing to charge as requested in the plaintiffs' fourth point.

12. In the answer to plaintiffs' seventh point.

13. In the answer to plaintiffs' ninth point.

21, 22 and 23. In the parts of the charge respectively enclosed in brackets above.

24. In refusing to allow the plaintiffs' counsel to read to the jury the opinion of the court in Kille v. Ege.

*S. Hepburn* and *S. Hepburn, Jr.*, for plaintiffs in error.—The landlord was admitted to defend without a disclaimer; this was error: Steinmets v. Logan, 3 Watts 160. A landlord will not be permitted to defend when delay will necessarily ensue: Linderman v. Berg, 2 Jones 301. Acquiescence in the tenant's plea of not guilty, for more than a year, and going to trial under it, is equivalent to an admission of possession of all the land claimed in the writ: Ulsh v. Strode, 1 Harris 433; Hill v. Hill, 7 Wright 521.

There was no evidence to affect the trust deed, and the question should not have gone to the jury: Merchants' Bank v. State Bank, 10 Wall. 662; Dean v. Fuller, 4 Wright 474; Kille v. Ege, 29 P. F. Smith 15; Douglass v. Mitchell, 11 Casey 445. George Ege clearly had curtesy in this tract: Dubs v. Dubs, 7 Casey 149; Brendlinger v. Brendlinger, 2 Id. 132; Evans v. Knorr, 4 Rawle 72.

The estate was a fee simple in Elizabeth Ege, and there was no intention expressed in the deed of depriving her husband of an estate by the curtesy. In Thornton's Executors v. Krepps, 1 Wright 393, it was held that the question is what the estate intended to be granted

[Ege *v.* Medlar.]

was, and whether in law curtesy is incident to such an estate, and not as to the intention of the testator relative to the claim of curtesy. If George Ege was entitled to curtesy, this estate was subject to the lien of judgments against him : Bank *v.* Stauffer, 10 Barr 398 ; McMillan & Crissman's Appeal, 2 P. F. Smith 434 ; and the sheriff's vendees, at the sale in 1838 of this property, held under him, and their possession during that time was not adverse to the heirs of Elizabeth Ege : Kille *v.* Ege, *supra.*

Those under whom the defendants claim did not enter by color of title : Jackson *v.* Oltz, 8 Wend. 440, 441 ; Zubler *v.* Schrack, 10 Wright 69. The evidence showed that the existence of the Moses Foulke tract was unknown to those in possession of it as such. Therefore their possession is limited to actual possession : Ament *v.* Wolf, 9 Casey 331 ; 9 Wright 448 ; Fitch *v.* Mann, 8 Barr 503 ; McArthur *v.* Kitchen, 27 P. F. Smith 69 ; Clark *v.* Trindle, 2 Id. 495.

The offer to read the opinion of this court in Kille *v.* Ege was to read it as an argument on the facts. Good *v.* Mylin, 1 Harris 530, was an offer to read the opinion in a reversed case on a second trial of the same case. The questions that arose in this case and in Kille *v.* Ege were substantially the same. Noble *v.* McClintock, 6 W. & S. 60, is in point.

*John Hays, A. B. Sharpe* and *Lemuel Todd,* for defendants in error.—The draft filed by the Mt. Holly Paper Company, when admitted to defend, was in effect a disclaimer. The plaintiffs were not surprised, nor were they injured.

The abstract of title was not an admission ; it is merely notice of a defence.

The verdict of the jury established the trust deed, and therefore erroneous rulings in this respect, if any, were harmless to the plaintiffs ; for such this court will not reverse.

If the intention of Michael Ege to exclude his son's title by the curtesy was clear and express, the latter has no curtesy : Cochran *v.* O'Hern, 4 W. & S. 99 ; Stokes *v.* McKibbin, 1 Harris 268 ; Rigler *v.* Cloud, 2 Id. 363. By the power of sale in the trust deed, a purchaser during the wife's lifetime would have taken a title free from any claim of the husband, and without his joining in the deed. After her death her heirs might have joined with the trustee in alienting the estate. In Dubs *v.* Dubs, *supra,* the trust expressly forbid the husband or wife aliening the estate. In Stokes *v.* McKibbin, *supra,* it is said that the object of the exclusion is to protect not only the wife, but the children from the husband's prodigality, and that this object would be but imperfectly obtained if he were allowed to resume his marital rights at her death. The other cases cited can be distinguished. In Thornton *v.* Krepps, 1 Wright 391, the devise was without the intervention of a trustee, and gave the estate directly to the devisee, and then gave a reversion of it in case of the devisee's death during

[Ege v. Medlar.]

minority.  In Faries' Appeal, 11 Harris 29, the devise was without
an intervening trustee, and without an express power of sale.  In
Haines v. Ellis, 12 Harris 255, the conveyance was direct, without
a trustee, "for the only, sole, separate and proper use and behoof
of the said Ann Eliza Hutchinson, her heirs and assigns for ever."
This was rightly held to convey a fee simple, so that the grantee
and her husband could alienate the property.  It follows that the
statute began to run in 1838, at the time of the sheriff's sale.

The purchasers at sheriff's sale in 1838 entered bonâ fide and in the
honest conviction that this tract was their property; they therefore had
a color of title: McCall v. Neely, 3 Watts 72; Green v. Kellum, 11
Harris 254; Wilson v. Howser, 2 Jones 109.  Where one enters
under color of title, cultivation of a part makes his possession co-
extensive with his claim: Burke v. Hammond, 26 P. F. Smith 172;
Susquehanna R. R. Co. v. Quick, 18 Id. 197; Baker v. Findley, 8
Harris 163; Barnhart v. Pettit, 10 Id. 139; Young v. Herdic, 5 P.
F. Smith 175; Stephens v. Leach, 7 Harris 262; Alden v. Grove,
6 Id. 377.  The defendants being thus in possession for thirty-six
years, have a title against all the world.  The Act of 22d April 1856
limits the right of action to thirty years after a right of entry has
accrued, even in cases of disability: Hunt v. Wall, 25 P. F.
Smith 416; Pratt v. Eby, 17 Id. 396.

Section 2 of the Act of 26th March 1785 bars the action; for, as
against Mrs. Ege and her trustee, the statute began to run in 1838.
An equitable estate is barred by adverse possession of the legal estate.
Under section 4 of the same act, the heirs of Mrs. Ege had ten years
after the death of George Ege to bring suit: Henry v. Carson, 9 P. F.
Smith 297; Lenhart v. Ream, 24 Id. 59.  The sheriff's vendees in
1838 had no notice of the trust deed, as it was not recorded till
1848; it cannot therefore be said that they held title under George
Ege until his death in 1858.  They took possession in the honest
belief that this tract was part of the iron works and belonged to
George Ege.

As to the 24th assignment, the plaintiffs' counsel read the opin-
ion of this court in Kille v. Ege, as if it had been delivered in this
case, and in reading it substituted the Moses Foulke tract for the
William Cox tract, mentioned in that case.

Mr. Justice GORDON delivered the opinion of the court, October
9th 1876.

On the second day of June 1815, Michael Ege, the elder, being
then owner of some eighty-seven tracts of land, situated along the
South Mountain, in the counties of Cumberland and Adams, exe-
cuted a deed, in trust, embracing, inter alia, the land in dispute, to
John Miller, for the use of Elizabeth, wife of George Ege, one of
the sons of the grantor.  On the next day (June 3d), he executed
for his three sons, George, Michael and Peter, severally, deeds

1 NORRIS—7

[Ege *v.* Medlar.]

embracing all the land remaining of the said eighty-seven tracts, not included in the trust deed above mentioned. The deed prepared for George was intended to convey all those tracts " comprising the Holly Iron Works estate." George and Peter refused to accept of the deeds thus executed to them; hence, on the death of Michael Ege, Sr., August 31st 1815, the lands recited in those deeds remained undisposed of. In September of the following year, partition was made, in due form, of the fifty-nine tracts remaining to the estate of Michael Ege, and those included in and designated as the " Mount Holly estate " were accepted by and confirmed to George Ege, under whom the defendants claim title. This estate, so accepted by George, was clearly defined in the proceedings of partition; and, as those proceedings were conducted by parties of intelligence, of full age and under the direction of eminent counsel, the probabilities of mistake are excluded. *Vide* Kille *v.* Ege, 29 P. F. Smith 15.

The Moses Foulke tract, now in controversy, was not one of those included in the partition, and could not, therefore, have been one of those assigned to George Ege. It follows that the sale by the sheriff in 1838, of the Mount Holly estate, as the property of George Ege, to the Farmers' and Mechanics' Bank, did not and could not pass title to the land in controversy, even though the parties to such sale so intended.

But, it is argued, and the court so held, that, by the amicable condemnation executed by George Ege on the 23d of December 1836, this tract, by the designation of outside boundaries, was included in the Mount Holly property; that the sheriff's deed, purporting to convey all the land within such boundaries, gave the Farmers' and Mechanics' Bank and its vendees color of title to the Moses Foulke tract, and, hence, their entry upon part thereof gave them constructive possession of the whole, the continuance of which for twenty-one years made them a perfect title by the Statute of Limitations. This would be correct if (1) the description in the condemnation and deed necessarily include the land in suit, and the party purchasing honestly believed that the sheriff's sale did pass the title to such land. If (2) the bank, or its vendees, did enter upon and claim this Moses Foulke tract *eo nomine.* But, in the first place, it was assuming too much to take for granted the first part of this proposition. It is true that this land lay within the outer lines of the Mount Holly estate, as described in the amicable condemnation, but so also did the Michael Ege and William Cox tracts, and, perhaps, several others of the trust estate; it is, however, going a great way to suppose, in the face of the fact that an accurate description of the Mount Holly property was of record, that the intention of George Ege was to include all this territory in the levy, or that the agents of the bank supposed that, by the sheriff's sale, they got title thereto. If, however, it was known, or ought to have been known, that that sale did not, in fact, embrace the Moses Foulke

[Ege v. Medlar.]

tract, then the purchaser acquired no color of title; for, as is said by GIBSON, C. J., in McCall v. Neely, 3 Watts 72, "an entry is by color of title when it is made under a bonâ fide and not pretended claim of title existing in another." Whether the circumstances warranted the defendants' vendors in supposing they had acquired title by the sheriff's sale, was a question not for the court, but for the jury. But, suppose they had color of title, then, was it definite or indefinite? Was it to the Moses Foulke tract *eo nomine*, or was it general, embracing, without particular definition, all the lands within the Mount Holly property? If it were the former, then might the possession of the defendants be extended, constructively, to the whole tract; if the latter, that possession must be confined to the actual work on the ground. It is not to be forgotten that mere color of title is valuable only so far as it indicates the extent of the disseisor's claim; if it fails in this, it fails altogether: Barnhart v. Pettit, 10 Harris 135.

The question then recurs, did those, from whom the defendants derive title, enter upon this land claiming by virtue of their color of title to the lines of the Moses Foulke tract? If they did so claim the evidence fails to show it; on the other hand, it is said by Frederick C. Kropff, who, at one time, with Paul D. Geisse, owned the Mount Holly estate, that they knew nothing about the Moses Foulke survey, but dug ore and cut timber where it suited them over the whole estate. From this testimony, it is manifest, that the claim was general to all the lands lying within the external lines of the Mount Holly property, without regard to internal tracts or divisions, and that it was under this general claim the bank and its vendees entered into the possession of and held the furnace fields. We need hardly say, that it is not possible for an indefinite claim such as this, to carry the right of the disseisor beyond his mere *pedis possessio*. Thus, under the evidence as we now have it before us, the controversy is narrowed down to that part of the premises which the defendants and their vendors have had in actual possession. Whether they can hold even this depends upon the time when the Statute of Limitations began to run against the plaintiffs' right of entry. The plaintiffs claim as heirs-at-law of Elizabeth Ege, the wife of George, by virtue of the deed of trust executed to John Miller, for her use, by Michael Ege, Sr.; whilst the defendants claim under George Ege. Now it is obvious that if, as the plaintiffs contend, George Ege had an estate in curtesy in the lands thus conveyed to his wife, the right of entry did not accrue to them until his death, and hence the statute could not begin to run before that period: Gernet v. Lynn, 7 Casey 94; Shallenberger v. Ashworth, 1 Id. 152; Crow v. Kightlinger, Id. 343. It is alleged that the Act of 1856 has introduced a different rule. Such however is not the case. That act does but affect the former rule as to persons of unsound mind, married women and minors,

[Ege *v.* Medlar.]

who, previously thereto, had ten years after the removal of their several disabilities within which to bring suit against such as might have intruded upon their right of entry ; now, however, by the statute above mentioned, the lapse of thirty years, from the time when such right of entry accrued, bars their right of action, though the disabilities therein referred to be not removed : Hunt *v.* Wall, 25 P. F. Smith 413. It will be observed, however, that the right of action in such persons is presupposed, for the time runs from the period when the right of entry begins, but where this right does not exist no action lies, and, hence, the statute can have no effect. So, in the case in hand, to say that the statute shall run from a date when the heirs of Elizabeth Ege had no right of entry, and consequently no right of action, is to say that they might be barred of such right by no default of their own and without the possibility of remedy. If, then, George Ege was tenant by the curtesy, the defendants, holding under him, could not be disturbed in their occupancy of the premises until his death. From that period the right of entry vested in the plaintiffs, and from that period only did the statute begin to run against them.

That George Ege had curtesy in this property is not doubtful. The estate conveyed to Elizabeth was a fee; whether legal or equitable matters not, as at law, in either case, curtesy attaches as an incident. Unless, therefore, there is something in the grant which clearly exhibits an intent to exclude the husband's right, equity will not interfere to annul the legal intendment : Cochran *v.* O'Hern, 4 W. & S. 95 ; Stokes *v.* McKibbin, 1 Harris 267. We discover no such intent in the deed before us. The expressions therein contained, such as, " for the purpose of promoting the interest of said Elizabeth, separate and apart from that of her said husband," and " to and for her and their sole and separate use and benefit," are but the ordinary terms used in such instruments, and import no intention to strip the husband of his curtesy. That no such intent existed in the mind of Michael Ege is further obvious, from the fact that he makes no provision to prevent the management or proceeds of the estate from passing into the hands of George. The duties of the trustee are purely passive except he might be directed to sell by the wife, but, even in that event, he could not control the disposition of the proceeds, for they were to pass to her absolutely and unshackled by any condition or restriction whatsoever. Almost of necessity, the management of this estate passed into the hands of the husband, and had it been sold there was nothing to prevent her making a gift to him of the whole proceeds ; so, in case of her death, he would have been entitled to a share thereof under our intestate laws. There being nothing, then, in the deed of trust, impairing the husband's rights or altering the statutory order of descent, an estate by the curtesy must be taken to have vested in George Ege : Dubs *v.* Dubs, 7 Casey 149.

[Ege v. Medlar.]

It is supposed that the power of sale found in the trust deed operates against this conclusion; but as that, of itself, does not work a conversion or alter the character of the estate granted, we cannot understand how it could be made to destroy one of the incidents thereof. The execution of the power might have had such an effect, but not the power unexecuted.

We think the plaintiffs' fourth point should have been affirmed. The evidence of the execution of the deed of trust is direct and positive. The lands which it purports to convey were not included in the proceedings in partition; it appears to have been duly acknowledged before competent authority, and probate was made of it by George D. Foulke, the subscribing witness, only a few days before it was recorded. Without an attempt to impeach, directly, this testimony, we cannot see how the fact that the identity of the George Ege tract, as described in the deed of trust, with the James Love tract, as described in the partition, can have the effect, even remotely, to prove the forgery of the deed of trust. At best it exhibits a mistake made, not, indeed, by Michael Ege, for his deed conveyed the land without regard to whether it was known as George Ege or James Love, but by Peter Ege and those who conducted the partition, and it is rather singular that such a mistake should be used to impeach the deed of the ancestor made in the preceding year. The proposition has the effect, not only to cure a party's own mistake, but to make it evidence in his own favor. So the force of the fact of the identity of the courses and distances set forth in the deed of 1815, with those in the return of survey made by Davidson in 1845, is completely nullified by the other fact, stated in the charge of the court, that the same description, with the exception of a single line, is to be found in the deed of Stephen Foulke to Kittera, Jago & Boyd, in 1795. In view of all the circumstances of this case, we think that the evidence of the fraudulent making of this deed, after the survey of 1845, is so slight that it ought not to have been submitted to the jury.

Ordinarily an abstract of title, filed by either party, under a rule of court, would be evidence; for its principal design is to relieve the case of the proof of such papers and evidences of title as may therein be admitted. Not only are the parties thus relieved of the preparation of unnecessary testimony, but the public business is expedited. Perhaps, as the plaintiffs had in evidence all that by the abstract was admitted, the ruling was harmless; nevertheless it would have been proper to have sustained their offer.

Under the 9th section of the Act of March 21st 1772, the Mount Holly Paper Company, as landlord of the defendants, was properly admitted of record to defend for the land covered by its leases.

It was right to refuse to permit the opinion of the Supreme Court to be read to the jury: Good v. Mylin, 1 Harris 538.

Judgment reversed and a *venire facias de novo* awarded.